**PELTON GRAHAM LLC**
Brent E. Pelton
Taylor B. Graham
Alison L. Mangiatordi
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800
www.PeltonGraham.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CRAIG DUKE,**<br><br>                          **Plaintiff,**<br><br>-against-<br><br><br>**CARRIAGE SERVICES, INC.,**<br><br>                          **Defendant.** | **COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Craig Duke ("Duke" or the "Plaintiff"), through his undersigned attorneys, Pelton Graham LLC, alleges as follows:

### NATURE OF THE ACTION

1.      Duke worked for Defendant Carriage Services, Inc. ("Carriage" or the "Defendant") as a Director of Support ("DOS") for the East North Region from February 2010 until he was unlawfully terminated in October of 2018.

2.      At the time of his termination, Duke had forty (40) years' experience in the funeral industry.

3.      Throughout Duke's employment with Defendant, Duke received high performance bonuses, his work was consistently praised, he was often held out as a model DOS and he was often asked to train new DOSs.

1

4.      Duke never received any warning or criticism from Defendant indicating that his performance was less than excellent.

5.      On June 3, 2016, Duke was diagnosed with stage IV lung cancer and informed Defendant of such and of his treatment plan.

6.      Defendant is self-insured and provides health insurance to its employees.

7.      Defendant constantly sought to reduce the amount it paid its employees in salary and benefits (S & B), especially when the stock price declined as it did in late 2018.

8.      As Duke's treatment cost Carriage a significant amount of money, Carriage discriminated against Duke by failing to promote him and ultimately terminating his employment with them in October of 2018 in violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a), as amended by the Americans with Disabilities Act Amendments Act of 2008 and the New York State Human Rights Law, §§ 290 *et seq.* of the New York Executive Law ("NYSHRL").

9.      Carriage also violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA") and NYSHRL in failing to promote and terminating Duke, who was sixty-four (64) years old when Defendants terminated his employment (sixty-three (63) when he was not promoted) and was one of the oldest employees in a management position at Carriage prior to his termination, and one of the oldest DOSs.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1343, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §§ 1332 and 1367.

11.     In addition, the Court has jurisdiction over Plaintiff's claims under the ADA

pursuant to 42 U.S.C. §§ 12101, *et seq*. and the ADEA pursuant to 29 U.S.C. §§ 621 *et seq*.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district and Defendant conducts business within this District.

13.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to the ADA, ADEA and the NYSHRL.

## THE PARTIES

**Plaintiff:**

15.     <u>Plaintiff Duke</u> has been, at all relevant times, an adult individual residing in Orange County, New York. He was an "employee" within the meaning of 42 U.S.C. § 12111(4), 29 U.S.C. § 630(f) and § 292(6) of the NYSHRL at all times relevant to this action.

16.     Plaintiff worked as a Director of Support ("DOS") for Defendant in charge of the East North Region until he was terminated in October of 2018.

**Defendant:**

17.     <u>Defendant Carriage</u> is an active Delaware corporation located at 3040 Post Oak Blvd., Suite 300 Houston, TX 77056.

18.     Defendant was an "employer" of Plaintiff within the meaning of 42 U.S.C. § 12111(5), 29 U.S.C. § 630(b) and § 292(5) of the NYSHRL at all times relevant to this action.

19.     Defendant had approximately one thousand (1,000) employees working for it for at least twenty (20) weeks during each year from 2010 through 2018.

## ADMINISTRATIVE PREREQUISITES TO ACTION

20.    Plaintiff timely filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), New York Division, on October 30, 2018.

21.    On August 16, 2019, Plaintiff received a Notice of Right to Sue letter issued by the EEOC, stating that the Plaintiff could file an action under Title VII, the ADA and the ADEA.

22.    Plaintiff filed the complaint in this case within ninety (90) days after the date on which he received Notice of Right to Sue.

23.    A copy of Plaintiff's Notice of Right to Sue is annexed hereto as Exhibit "A."

## STATEMENT OF FACTS

**Duke's Employment with Carriage**

24.    Duke worked in the funeral industry for forty (40) years, beginning as a New York State Licensed Funeral Director in 1978.

25.    In February of 2010, Duke was recruited by Carriage to become a DOS for the East North Region, which included New York, New Jersey, Baltimore, Pennsylvania, Massachusetts and Connecticut.

26.    As a DOS, Duke was responsible for overseeing the operations of approximately seventeen (17) funeral homes in the Northeast region of the United States, acquiring new homes, hiring managing partners to run the homes, developing and maintaining relationships with the former owners or managing partners ("MP") of the homes, reviewing the performance of the homes and helping improve performance of the homes.

27.    At Carriage, Duke's starting salary in 2010 was approximately one hundred thousand dollars ($100,000.00), which increased over time to approximately one hundred and seventy-seven thousand dollars ($177,000.00).

28.    Each year throughout his employment with Carriage, Duke was given raises,

incentive payments of between fifteen and thirty thousand dollars ($15,000.00-$30,000.00), twenty-five thousand ($25,000.00) in 2017, stocks or stock options, and large "high performance" bonuses (in 2015, for example, Duke received a two hundred and fifty thousand dollars ($250,000.00) high performance bonus, in 2017, it was sixty-one thousand dollars ($61,000.00)).

29.     Throughout his employment with Carriage, Duke's performance was never criticized, and he never received any warning or criticism that his performance was less than excellent.

30.     Duke's work was consistently praised and he was often held out as a model DOS and was often asked to train new DOSs.

31.     Duke worked with Carriage until he was unlawfully terminated in October of 2018, in violation of the ADA, ADEA and NYSHRL.

**Disability and Age Discrimination**

I.    <u>Cancer Diagnosis and Failure to Promote</u>

32.     Carriage is self-insured and provides health insurance to its employees.

33.     Throughout Duke's employment with Carriage, Duke heard several executives complain that because the company is self-insured, ongoing catastrophic care healthcare costs and catastrophic illnesses had a substantial impact upon Carriage's bottom line and had prevented the company from hitting its profit targets.

34.     Duke was informed by more than one colleague who worked out of Carriage's Houston office that similar comments were made in operations meetings, specifically that the Senior Analyst Brijesh Patel ("Patel"), analyst Peggy Schappaugh ("Schappaugh") who worked directly under Patel and other individuals in the operations/analyst department made comments about the high cost of benefits that lead to increased salary & benefit ("S&B") costs.

35.     These individuals complained that certain employees, including those with cancer,

those injured in accidents, children born with medical complications and employees with numerous children cost Carriage a disproportionate amount of money, and they wished that they were able to analyze the amount that each employee's healthcare cost the company so that they could take action to reduce costs.

36.     Such comments included Patel stating "Jesus Christ, these babies are costing [Carriage] one million dollars" in reference to Brian Stanton's two (2) premature babies. Furthermore, Patel, Schappaugh and others said the individuals with high healthcare costs would soon be gone.

37.     On June 3, 2016, Duke was diagnosed with stage IV lung cancer and began treatment nearly immediately.

38.     Duke informed Carriage of his diagnosis and treatment plans.

39.     Duke initially began a regimen of treatment with chemotherapy for approximately eight to nine (8-9) months.

40.     When Duke's cancer stopped responding to chemotherapy, Duke enrolled in and is still undergoing a drug trial treatment at Memorial Sloan Kettering.

41.     Duke's cancer is responding well to this treatment.

42.     The first year that Duke had cancer and was undergoing chemotherapy his treatment is believed to have cost Carriage approximately five hundred thousand dollars ($500,000).

43.     Once Duke was on the trial drug, Duke's treatment during the second year is believed to have cost Carriage approximately three-hundred and fifty thousand dollars ($350,000).

44.     In June of 2018, Duke's immediate supervisor at the time, Mark Bruce ("Bruce"), was promoted from RP of the East to Chief Operating Officer ("COO") of Carriage.

45.    This left the position of RP open in Duke's region.

46.    Duke was familiar with a large part of the East region as he was initially in charge of the East North region as well as several of the funeral homes in what is now called the Eastern Region North East prior to an expansion approximately three (3) years ago which resulted in Carriage reformatting several of its districts.

47.    After the reformatting, while Duke no longer directed approximately five (5) of the homes in the Eastern Region North East, several of the former owners and MPs in the Eastern Region North East continued reach out to Duke for his expertise and assistance until the time of his termination.

48.    Due to Duke's extensive knowledge of the industry, seniority and highly held regard at Carriage as well as his familiarity with the entire East region as their long time DOS, Duke would have been the natural choice for a promotion to RP; however, due to Duke's cancer and age, he was passed over for the promotion, and another DOS who only worked in the South East (i.e., Florida), Chris Manceaux ("Manceaux"), who is approximately forty-eight (48) years old, was promoted to RP, in violation of the ADA, ADEA and NYSHRL.

II.    September Meetings and Discriminatory Termination

49.    After years of steady stock price increases from 2012 up to $28.58 on April 24, 2018, Carriage's stock price suffered a decline from April of 2018 through the end of 2018 (to a low of $14.50 on December 24, 2018).

50.    Carriage blamed the 2018 stock drop on the increase in cremation in the industry amongst other factors.

51.    Late in the week of September 17, 2018, when the stock price was down over six dollars (around $22.16), Duke received an email from headquarters regarding mandatory meetings, which would take place the following week (September 24 through September 28, 2018) in

Houston (the "September Meetings").

52.     The September Meetings kicked off with Chief Executive Officer Melvin C. Payne ("Payne") letting the attendees know that Carriage needed to examine each of its business units in an effort to achieve his goals and to reverse the stock slide.

53.     Payne labeled this strategy as "Good to Great Part II" and set forth that it required that employees look at all revenue and expense items in order to improve company financial metrics.

54.     Payne once again stressed the importance of the "4Es": Energize, Energy, Edge and Execute as fundamental to transitioning the company.

55.     Mike Loeffel ("Loeffel") told the attendees that the company's health insurance plan was being re-designed and that it was open enrollment.

56.     Patel and Bruce passed out sheets with statistics on each of the funeral homes acquired by Carriage and placed each home into a color category based on performance from green (growth and predictability) to red (turn around with urgency) to purple (look to divest).

57.     DOSs and Analysts were divided up into groups to each work on one color category, regardless of which color category the homes they oversaw were given.

58.     Each team looked at profit and expense items on a property by property basis to come up with recommendations for operational improvements.

59.     Only two (2) of the funeral homes that Duke was overseeing were in the red category, while most if not all of the other DOSs had more in the red than he did.

60.     Duke was assigned to work on the red category homes, along with DOS Bob Hensley (with more homes in the red than Duke) and analyst Chris Cooper.

61.     Duke was told that, due to his extensive knowledge of the industry, he was assigned

to the most difficult group.

62.    Over the next couple of days, the DOSs and Analysts came up with action plans to turn around the funeral homes in their assigned color categories.

63.    After the meetings, the DOSs and Analysts were given the analysis for the funeral homes in each of their respective regions, which included a large number of firings, and told to execute. In execution, however, DOSs were warned to "do no harm."

64.    Duke received his marching orders, but noticed that the Thomas F. Dalton Funeral Homes ("Dalton"), which were recently acquired in his region for $23 million dollars, had incorrect numbers and were, in fact, already doing better than the projections indicated by the analysts.

65.    Despite this, Duke was instructed to speak to the MPs of those homes about terminating nine (9) employees.

66.    Duke voiced his concern about these instructions because he was concerned that it would do harm and because the internal numbers were incorrect for the Dalton properties.

67.    However, when he was directed to go ahead and execute as set forth in the original plan, he did so.

68.    This difficult task was completed within days of Duke returning to his region.

69.    On the morning of Thursday, October 4, 2018, Duke called Manceaux to let Manceaux know that he completed the terminations at Dalton and Manceaux asked if Duke was available on that Friday, October 5, 2018 to meet.

70.    Duke was not available on that Friday because, as Manceaux knew, Duke had an appointment at Memorial Sloan Kettering. Manceaux called Duke back the evening, of October 4, 2018 and told Duke "this partnership [between Carriage and Duke] was not working out."

71.    Duke was completely shocked as he had never received anything but positive feedback regarding his performance, and asked Manceaux what he meant and whether Duke was fired. Manceaux said yes.

72.    No explanation was provided at that point or any point thereafter for Duke's termination.

73.    It is clear that the reason for Duke's termination was due to his medical condition and the fact that Duke's treatment was costing Carriage money directly because they are self-insured, as well as due to Duke's age (as set forth below).

74.    There were at least two (2) similar prior lawsuits to this one for disability discrimination against Carriage brought by former employees who were undergoing, or planning to undergo, significant healthcare costs: *Raiborn v. Carriage Services, Inc., et al.*, 4:15 Civ. 01355 and *Joy v. Carriage Services, Inc., et al.*, 2:17 Civ. 00116, both which were filed in the Southern District of Texas.

75.    Based upon Duke's experience at the September meetings, it is clear that Carriage was in the process of undertaking a line-item by line-item review of all expenses, which resulted in Duke's termination, and it is evident that Duke was terminated in an effort to save Carriage costs.

III.    Age Discrimination

76.    At sixty-four (64) years old, Duke was one of the oldest employees in a management position at Carriage prior to his termination, and one of the oldest DOSs.

77.    The other DOSs and RPs are in their forties or fifties, Patel is in his forties and the analysts are typically in their thirties.

78.    Throughout Duke's employment with Carriage, Duke heard numerous comments regarding the "old" age of various former funeral home owners or managing partners, who were

around Duke's age.

79.     Such former owners or MPs were referred to as "old," "that old dog," "f***ing dinosaurs" who were said to have "outlived their usefulness" or who "were not energized."

80.     These comments were made without regard to their job performance.

81.     Manceaux boasted taking older former owners and MPs "out to the street and shoot[ing] them in the head."

82.     Duke and other DOSs would be told that we have "got to get [older employees] out" by transitioning them toward retirement.

83.     Duke was told that similar comments were made at Carriage's corporate headquarters in Houston.

84.     Duke was informed by more than one colleague who worked at the Houston office that such discriminatory comments were made at the corporate headquarters by Patel and his team, including analyst Schappaugh, regarding Duke's age.

85.     All the while, most of the funeral homes in Duke's region were consistently over-performing with respect to Carriage's projections and Duke's performance was superior to other DOSs.

86.     One of the most egregious bad-talkers about older employees was Patel, who would often call Duke from his car and scream about the older MPs or former owners he wanted Duke to transition as "old" and "f***ing dinosaurs."

87.     It was Carriage's official corporate policy that was frequently utilized to transition former owners or MPs along with other older workers who worked in Carriage's upper management who were believed to be "too old" (i.e., in their sixties).

88.     Duke was often told to speak to "older" MPs to discuss a retirement plan for them.

89.    During the June managing partner meeting, the DOSs were instructed by Bruce not to hang out late at the bar with MPs.

90.    Duke followed these instructions, however, Manceaux asked Duke why he never hung out late at night, insinuating that Duke was older than Manceaux and others. Duke told him that he was acting as Bruce instructed him to.

91.    Duke made it clear to Carriage that he intended to work into his mid-seventies.

92.    Notwithstanding this, Peter Banks ("Banks") overheard Schappaugh state at the September Meetings that Duke would not be working with Carriage much longer.

IV.    Shareholder Calls and Termination of Patel and Bruce

93.    After Duke was terminated, there was a quarterly shareholder call on November 1, 2018.

94.    Payne's explanation for low quarterly stock prices was that medical expenses had increased the salary and benefits.

95.    On this call, Payne announced that Patel and Bruce were terminated with a vague explanation of their termination being that they were "leading from behind."

96.    On the next shareholder call in late January, Payne insinuated that Carriage performed an "investigation" into Patel's conduct and discovered a certain attitude about people which led to Patel's and Bruce's termination.

97.    Upon information and belief, Patel's termination was related to the allegations in Duke's complaint.

98.    Moreover, another DOS Peter Banks ("Banks") quit his job with Carriage around the same time that Duke was terminated, in large part due to the overall age and disability-based discrimination and harassment by Patel.

99.    Banks made it clear in his resignation letter addressed to Payne that the reason for

his resignation was due to Patel's discriminatory words and actions toward him and Carriage's employees as well as Bruce's turning a blind eye to Patel's conduct.

100.    Banks participated in an exit interview with Vicky Blinderman where he was asked further questions about the reason for his resignation.

101.    After Banks left his employment with Carriage, he heard details about the investigation into Patel and Bruce, which made it clear that their termination was not merely a financial decision but rather was based on Patel's behavior and Bruce's allowing such behavior to go on for so long.

## FIRST CAUSE OF ACTION
## AMERICANS WITH DISABILITIES ACT – DISABILITY DISCRIMINATION

102.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

103.    Plaintiff has lung cancer, which is a "disability" within the meaning of the ADA.

104.    Plaintiff is a "qualified individual with a disability" within the meaning of the ADA.

105.    Defendant had notice of Plaintiff's disability as Plaintiff informed Defendant of such disability. Defendant was aware of the cost of Plaintiff's disability as it was covering the cost of Plaintiff's treatment, as it was a self-insured company.

106.    Plaintiff was qualified for the position of DOS because he can perform his duties as a DOS with his disability as demonstrated by his nine (9) excellent years of service and high performing funeral homes in his district, and was the most qualified individual for the RP position of the East.

107.    As is set forth in detail above, Defendant failed to promote and ultimately terminated Plaintiff because of his disability and the cost of his disability to Defendant in violation of the ADA.

13

108.    Such failure to promote and termination amounts to discrimination under the ADA.

109.    As a result of the unlawful discrimination by Defendant, Plaintiff has suffered substantial money damages, including, but not limited to, loss of wages, loss of future earnings and appreciation thereon.

110.    In addition, as a result of the willful and unlawful discrimination by Defendant, Plaintiff has suffered severe humiliation and mental anguish, psychological, physical and emotional damages and damage to his professional reputation.

111.    As a result of the foregoing actions by the Defendant, Plaintiff has been damaged to his person, property and employment.

112.    As a result of the foregoing, Plaintiff is entitled to backpay with interest, front pay, and compensatory damages and liquidated/punitive damages, in an amount to be proved at trial.

**SECOND CAUSE OF ACTION**
**<u>NEW YORK STATE HUMAN RIGHTS LAW – DISABILITY DISCRIMINATION</u>**

113.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

114.    Defendant terminated Plaintiff's employment because of his disability and/or perceived disability in violation of the NYSHRL, even though Plaintiff was capable of doing the duties of his job as a DOS.

115.    Defendant has discriminated against Plaintiff in the terms and conditions of his employment on the basis of his disability and/or perceived disability in violation of the NYSHRL.

116.    As a result of the unlawful discrimination by Defendant, Plaintiff has suffered substantial money damages, including, but not limited to, loss of wages, loss of future earnings and appreciation thereon.

117.    In addition, as a result of the willful and unlawful discrimination by Defendant, Plaintiff has suffered severe humiliation and mental anguish, psychological, physical and emotional damages and damage to his professional reputation.

118.    As a result of the foregoing actions by the Defendant, Plaintiff has been damaged to his person, property and employment.

119.    As a result of the foregoing, Plaintiff is entitled to backpay with interest, front pay, and compensatory damages and liquidated/punitive damages, in an amount to be proved at trial.

**THIRD CAUSE OF ACTION**
**AGE DISCRIMINATION IN EMPLOYMENT ACT**

120.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

121.    Plaintiff was within the protected age group under the ADEA as he was sixty-three (63) years old when he was not promoted to the position of RP and was sixty-four (64) years old when he was terminated from his job with Defendant.

122.    Plaintiff was well qualified for the DOS position as he had forty (40) years' experience in the industry and nine (9) years as a DOS with Defendant and was held in high regard at Carriage.

123.    Plaintiff was well qualified for the RP position as he had more experience in the industry and specifically, more familiarity with the East region than Manceaux who was promoted instead of Plaintiff.

124.    Plaintiff experienced adverse employment actions of failure to promote and termination due to his age.

125.    Plaintiff's age gives rise to an inference of discrimination given the derogatory comments made by those in upper management, including calling older employees "old dogs,"

"dinosaurs," saying they were "losing their faculties," "losing their way," didn't have "energy" or were "outliving their usefulness" without regard to their underlying performance.

126.    Plaintiff's age was the "but for" cause of discrimination due to specific comments made with respect to Plaintiff that he was "old and tired."

127.    As a result of the unlawful discrimination by Defendant, Plaintiff has suffered substantial money damages, including, but not limited to, loss of wages, loss of future earnings and appreciation thereon.

128.    In addition, as a result of the willful and unlawful discrimination by Defendant, Plaintiff has suffered severe humiliation and mental anguish, psychological, physical and emotional damages and damage to his professional reputation.

129.    As a result of the foregoing actions by the Defendant, Plaintiff has been damaged to his person, property and employment.

130.    As a result of the foregoing, Plaintiff is entitled to backpay with interest, front pay, and compensatory damages and liquidated/punitive damages, in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW – AGE DISCRIMINATION

131.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

132.    By its actions detailed above, Defendant unlawfully discriminated against Plaintiff on the basis of his age in violation of the NYSHRL.

133.    As a result of the unlawful discrimination by Defendant, Plaintiff has suffered substantial money damages, including, but not limited to, loss of wages, loss of future earnings and appreciation thereon.

134.    In addition, as a result of the willful and unlawful discrimination by Defendant, Plaintiff has suffered severe humiliation and mental anguish, psychological, physical and emotional damages and damage to his professional reputation.

135.    As a result of the foregoing actions by the Defendant, Plaintiff has been damaged to his person, property and employment.

136.    As a result of the foregoing, Plaintiff is entitled to backpay with interest, front pay, compensatory damages and liquidated/punitive damages, in an amount to be proved at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      An order tolling the statute of limitations;

b.      A declaratory judgment that the practices complained of herein are unlawful under the ADA, ADEA and NYSHRL;

c.      An injunction against Defendant and its officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendant, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

d.      An award of compensatory damages as a result of Defendant's unlawful discrimination pursuant to the ADA, ADEA, NYSHRL and supporting regulations;

e.      An award of liquidated and/or punitive damages as a result of Defendant's unlawful discrimination pursuant to the ADA, ADEA, NYSHRL and supporting regulations;

f.      An award of monetary damages to be proven at trial for all unpaid salary and commission payments withheld from Plaintiff by Defendants in breach of Plaintiff's employment agreement;

g.      An award of compensatory damages in an amount to be shown at trial for past and

future economic and non-economic losses, including lost wages, future lost wages,

pain and suffering, emotional distress and mental anguish;

h.      An award for exemplary and/or punitive damages in an amount to be shown at trial

as a result of Defendant's willful and malicious discriminatory and illegal conduct;

i.      An award of prejudgment and post-judgment interest;

j.      An award of costs and expenses of this action together with reasonable attorneys'

and expert fees; and

k.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury on all questions of fact raised by the complaint.

Dated: New York, New York
          October 8, 2019

Respectfully submitted,

**PELTON GRAHAM LLC**

By: _____

Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Alison L. Mangiatordi (AL 1020)
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiff*

# EXHIBIT A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820
District Office: (212) 336-3620
General FAX: (212) 336-3625

Re:    **EEOC Charge No. 520-2019-00471    v.    CARRIAGE SERVICES, INC.**

Dear Charging Party,

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission") has reviewed the above-referenced charge according to our charge prioritization procedures. These procedures, which are based on a reallocation of the Commission's staff resources, apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce.

In accordance with these procedures, we have examined your charge based upon the information and evidence you submitted. You allege you were discriminated and retaliated against, in violation of the Title VII of the Civil Rights Act of 1964, as amended.

Based on an analysis of the evidence submitted, the Commission is unable to conclude that the information establishes a violation of Federal law on the part of Respondent. This does not certify that Respondent is in compliance with the statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.

The Commission's processing of these charges has been concluded. Included with this letter is your Notice of Dismissal and Right to Sue. Following this dismissal, you may only pursue this matter by filing suit against the Respondent named in the charges **within 90 days** of receipt of said notice. Otherwise, your right to sue will be lost.

Please contact Federal Investigator Christiana R. Doriety at Christiana.Doriety@eeoc.gov if you have any questions.

Sincerely,

Christiana R. Doriety      for
Federal Investigator                              Date

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Craig Duke**
**19 Putters Way**
**Unit 4**
**Middletown, NY 10940**

From:  **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

| | |
|---|---|
| [ ] | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2019-00471** | **Christiana R. Doriety,**<br>**Investigator** | **(917) 410-4022** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

*Equal Pay Act (EPA):*  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

**Kevin J. Berry,**
**District Director**

8/16/19
*(Date Mailed)*

cc:

**CARRIAGE SERVICES, INC.**
**3040 Post Oak Blvd.**
**Suite 300**
**Houston, TX 77056**

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities"** now include the **operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

➤ **Only one** major life activity need be substantially limited.

➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.